# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Criminal Case Number** |
| | ) | **00-00004-01/08/09-CR-W-ODS** |
| **Michael D. Hatcher,** | ) | |
| **Angelo Porello, and** | ) | |
| **Joseph Anthony Porello,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## Report and Recommendation

This case was tried to a jury from February 12, 2001 to March 7, 2001, and resulted in

various criminal convictions for defendants Joseph Anthony Porrello, Angelo Porrello and

Michael Hatcher as well as other co-defendants.  Following an appeal to the Eighth Circuit, the

case was remanded to the District Court.  *United States v. Hatcher*, 323 F.3d 666 (8th Cir. 2003).

At the heart of the limited issue on remand are a series of tape-recorded telephone conversations.


Specifically, prior to trial, the defendants learned that telephone conversations involving

certain  alleged co-conspirators had been recorded at (and by) a pretrial detention center.  The

defendants requested discovery of all of those tape-recorded conversations.  The District Court

ultimately directed discovery of approximately 5,200 of those recorded conversations prior to

trial, but declined to order discovery of any tape-recorded conversations between the co-

conspirators and their attorneys. On appeal, the Eighth Circuit held that the tape-recorded

conversations between co-conspirators and their attorneys were also discoverable and remanded

the case so that the District Court could consider the effect, if any, of the non-disclosure of these

recordings on the prosecution of defendants. *Id*. at 674.

## A. Overview

Prior to the criminal trial, the tape-recorded conversations between the co-conspirators

and their attorneys had never been marshaled, cataloged or transcribed (and, in fact, the tape

recordings were not even in the possession of government attorneys). As a result, on remand,

the parties have engaged in a protracted and diligent period of joint discovery and cooperation in

an effort to determine how many conversations between the co-conspirators and their attorneys

were tape-recorded at the pretrial detention center, as well as the most effective way to

memorialize and analyze those conversations.[1] Ultimately, the parties determined that there

were 199 tape-recorded conversations between the co-conspirators and their attorneys. The

tapes of these conversations at issue, thereafter, were provided to the defendants for their review.

Subsequently, on March 29, 2004, an evidentiary hearing was held to allow the parties to address

the issue of what affect, if any, the non-disclosure of these tape-recorded conversations had on

the prosecution and trial of the case.

At the evidentiary hearing, the defendants offered 58 of the initial 199 tape-recorded

conversations between the co-conspirators and their attorneys into evidence. Of these 58 tape-

recorded conversations, 52 involved conversations between co-conspirator Clarence Burnett

("Burnett") and his attorneys, 5 involved conversations between co-conspirator Thomas Benton

---

[1]      Following remand, the volume of tape-recorded conversations at the detention
center which the parties had to search and the technical difficulties encountered in that search
resulted in the case pending on remand longer than anticipated by any of those involved.

("Benton") and his attorney, and 1 involved a conversation between co-conspirator Bobbi Bolton ("Bolton") and her attorney.[2]   It is these 58 tape recordings which are the focus of the Court's consideration on remand.

## B.  The underlying trial proceedings

Before delving into the tape-recorded conversations at issue, the Court must briefly discuss the trial.  It is well settled that not every non-disclosure of discoverable information entitles a criminal defendant to a new trial.  In this case, in none of these tape-recorded conversations is there any statement by Burnett, Benton, or Bolton which <u>directly</u> exculpates or exonerates any of the defendants.  Consequently, the Court must consider whether the non-disclosure of these tape-recorded conversations affected the prosecution of this case in any meaningful way, unduly prejudiced the defendants, or would have been likely to change the outcome of the trial.  *See*, *e.g.*, *United States v. Bagley*, 473 U.S. 667, 682 (1985).  In that regard, non-disclosed evidence that is merely cumulative of matters thoroughly and adequately dealt with at trial will not justify a new trial inasmuch as any error was harmless.

> The defendant must demonstrate that he was denied a fair trial, by
> showing that the favorable evidence could reasonably be taken to
> put the whole case in such a different light as to undermine
> confidence in the verdict.

*United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996).

Burnett, Benton, and Bolton each testified at trial on behalf of the government.  It is self-evident from the record of the trial and the arguments of the parties on remand that Burnett was a significant witness for the government's case, testifying on direct examination for approximately

---

[2]        Among the 5,200 tape recorded conversations supplied to the defendants before the trial, a similar majority were of conversations involving Burnett.

Case 4:00-cr-00004-ODS   Document 607   Filed 06/22/05   Page 3 of 13

three hours and on cross-examination for approximately eight hours.  By contrast, Benton and

Bolton each testified on direct and cross-examinations for much shorter periods of time.

According to the government's theory of the case against the defendants, Burnett

organized a group of individuals to rob a string of jewelry stores.  This group included defendant

Michael Hatcher.  At trial, the evidence against Hatcher came primarily from Burnett's

testimony, although other witnesses and phone records of conversations tended to corroborate

Burnett's testimony.  *Hatcher*, 323 F.3d at 669.  Based on the evidence presented at trial,

following each robbery, Burnett would take the stolen jewelry to a pawn shop operated by

defendants Angelo and Joseph Porrello.  The Porrellos would then fence the jewelry.  The court

of appeals found that there was substantial evidence indicating that the Porrellos acted as fences

for the jewelry, but that the only evidence directly linking the Porrellos to the planning of the

robberies came through the testimony of Burnett or through the testimony of other witnesses

who were relating what Burnett had told them at the time of the robberies.  *Hatcher*, 323 F.3d at

670.

During the extensive cross-examination of Burnett he was questioned at length about his

credibility and his motivation for cooperating with the government, his prior criminal history

(which included burglaries and drug dealings), and discrepancies between his testimony on

direct examination and information contained in FBI 302 reports of interviews with him.  Burnett

was thoroughly cross-examined on his understanding of how the criminal justice system

operated and the value and/or necessity of cooperating with the government in order to receive

more favorable treatment (Tr. at 1466-74).  Burnett was cross-examined as well with respect to

recorded telephone conversations he had with his wife, reporters, and others.  He was also

extensively cross-examined about alleged promises by the government to reduce his sentence and efforts on his part to recruit the testimony of others in favor of the government (Tr. at 1524, 1526, 1529, 1543, 1564, 1567, 1580-81, 1734-35, 1755, 1757, and 1791-93).

In the course of this lengthy cross-examination, Burnett testified that, in his opinion, substantial assistance provided by a defendant to the government was a form of bribery and that innocent people were often caught up in the system (Tr. at 1505-18). He also was questioned about calling news reporters to expose his self-described "government-bribery" belief, to wit: that the government was causing people to lie under oath, that the government was using unreliable witnesses, and that the only way for a defendant to "win" was to offer the government substantial assistance in return for a downward departure motion under the Federal Sentencing Guidelines. In fact, Burnett told the jury that shortly after he was convicted in his drug dealing case and faced a sentence of 30 years to life, the government told him that it could help him get his time "cut" (Tr. at 1505-18).

During his cross-examination, Burnett also conceded that, but for his own cooperation with the government in testifying against the defendants, he would likely have spent the rest of his life in jail (Tr. at 1521). With regard to his motivation, Burnett testified that he did not want to get a prison sentence of over five years, that to accomplish that end he needed to be creative, that he wanted to share in any forfeitures the government obtained, and that he wanted to get the benefit of having caused other witnesses to cooperate with the government (Tr. at 1523-27, 1573).

In addition, a tape-recorded conversation between Burnett and his wife was played to the jury wherein Burnett told his wife that he had spoken with counsel for the government.

5

According to Burnett's statements, government counsel made promises to Burnett about what he could expect to receive for his cooperation. After the tape recording was played for the jury, Burnett testified that his statements on that particular tape recording were lies (Tr. at 1791-93).

Burnett also testified on cross-examination about his concern that defendants awaiting trial would obtain information about cases involving still other defendants and then fabricate stories about those cases in an effort to curry favor with the government. According to Burnett, defendants had only two choices: to "do the time" or "cooperate" with the government (Tr. at 1536-40), and that if defendants did not cooperate in order to receive reduced sentences, they would be "snitching" for nothing (Tr. at 1556-57). The cross-examinations of Benton and Bolton at the criminal trial, while complete, was less lengthy but also covered questions about their credibility and motivation for cooperating with the government.

## C. The tape-recorded conversations

As noted above, of the 199 tape-recorded conversations between the co-conspirators and their attorneys recorded at the pretrial detention center, 58 were introduced by defendants at the evidentiary hearing on remand.[3] Moreover, of those 58 tape recorded conversations, only 42 were specifically identified by the defendants as prejudicially affecting the trial by their non-disclosure.[4]

---

[3] Transcripts of these tape recorded conversations are contained in Exhibit 3, Tabs 1-58, which was admitted at the evidentiary hearing on remand.

[4] The single tape recorded conversation involving Bolton and her attorney was not identified in any of defendants' pleadings and its non-disclosure was not argued as resulting in any prejudice to defendants (Exh. 3, Tab 52). Three of the tape recorded conversations involving Benton and his attorney were not identified in any of defendants' pleadings and their non-disclosure was not argued as resulting in any prejudice to defendants (Exh. 3, Tabs 40, 42, 47). Twelve of the tape recorded conversations involving Burnett and his attorney were not

6

Forty of the tape-recorded conversations identified by defendants in their pleadings were conversations involving Burnett and his attorneys, while the remaining two tape recorded conversations involved Benton and his attorney. The subject matter of the 42 tape-recorded conversations can be grouped into a relatively small number of topics, with virtually all of them dealing in one way or another with the subject of Burnett's and Benton's credibility and their motivation for cooperating. First, there are conversations where Burnett and Benton (although primarily Burnett) discussed with their attorneys the extent and benefit of any cooperation with the government and the potential sentence they might receive as a result of that cooperation. Second, there are conversations which the defendants argue show that Burnett made statements at various times that were untruthful. Third, there are conversations dealing with Burnett's opinion of the credibility of other witnesses. Fourth, there are conversations between Burnett and his attorneys about the government's evidence and theory of the case. Fifth, there is one conversation between Burnett and his attorney which the defendants argue reflects a potential violation of the Court's order regarding the sequestration of witnesses.

After reviewing these tape-recorded conversations and the parties' arguments associated with them, for the reasons stated below, the Court concludes that the non-disclosure of these tape recorded conversations did not affect the prosecution of this case in any meaningful way, did not unduly prejudice the defendants and would not have been likely to change the outcome of the

---

identified in any of defendants' pleadings and their non-disclosure was not argued as resulting in any prejudice to defendants (Exh.3, Tabs 3- 4, 12-13, 16-18, 20, 26, 33, 37, 45). An independent review of these 16 tape recorded conversations does not show that their non-disclosure to defendants prior to trial had any effect on the prosecution of the case, resulted in any prejudice to defendants, or would have been likely to change the outcome of the trial. *See United States v. Bagley*, 473 U.S. 667, 682 (1985).

7

trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

## 1.  Burnett's Cooperation

Most of the subject tape-recorded conversations (30) of Burnett and Benton with their attorneys involved a discussion of the extent they should cooperate with the government, the benefit they should expect from such cooperation, and the possible sentence they might receive in consideration of such cooperation (Exh. 3, Tabs 2, 7-11, 14-15, 21, 25, 27-32, 34-36, 38-39, 41, 43-44, 48-50, 53, 55-56).  Twenty-eight of these conversations were between Burnett and his attorneys and two of the conversations were between Benton and his attorneys.  These subjects were covered extensively in the cross examination at trial of Burnett and Benton.  (Tr. at 1466-74, 1505-18, 1521, 1523-27, 1529, 1543, 1564, 1567, 1573, 1580-81, 1734-35, 1755, 1757, 1791-93).

The most significant statements in this group include Burnett opining that the government does not care if someone lies in their testimony and that since a cooperating defendant is not sentenced until after they testify they could lie in their testimony (Exh 3, Tab 2 at pp.6-7, 12).  These two statements appear to be made in the context of Burnett discussing with his counsel the testimony of another witness against Burnett and whether that testimony is credible and how the witness' testimony could be attacked.  Burnett does not appear to be referring to his own testimony.

Burnett's opinion that it is easier for cooperating witnesses to lie in their testimony because they have not yet been sentenced, frankly, makes no sense.  The fact that sentencing is withheld to see if a cooperating witness testifies truthfully, and therefore receives the benefit of the bargain, supports a witness' credibility rather than detracts from it. The Court concludes that,

8

had these conversations been disclosed to the defendants prior to trial, the usefulness to the defendants of the information contained therein would have been merely cumulative of areas already covered in detail in cross-examination at trial. Importantly, at no time in these conversations did Burnett say that he would lie as part of his cooperation with the government nor did he make any statements that directly exculpated or exonerated the defendants.

In a few conversations, Burnett said that there is information about crimes other than those involved in the jewelry store robbery case which he had not yet told the government as part of his cooperation (Exh. 3, Tab 15 at p. 9; Tab 30 at p. 5)   Burnett's attorney thereafter advises him that the more information he provides the government the better his chances are for a reduced sentence (Exh. 3, Tab 38 at p. 3; Tab 31 at pp.2-4). Ultimately, Burnett provided this information to the government (Exh. 3, Tabs 43, 48).  Again, the Court finds that disclosure of these conversations prior to trial would not have helped the defendants or materially affected the credibility of Burnett.

The remaining tape-recorded conversations in this group deal with Burnett and Benton discussing plea negotiations with their attorneys and their willingness and ability to cooperate with the government.  While there is information in these discussions which is relevant to the issue of Burnett's and Benton's credibility, it is cumulative of the cross-examination of Burnett and Benton at trial.  Burnett, in particular, was cross-examined at length about his motivation for cooperating with the government and the truthfulness of his testimony.  Disclosure of these conversations to the defendants prior to trial would not have affected the prosecution.

9

## 2. Burnett's truthfulness

Three of the tape-recorded conversations between Burnett and his attorneys arguably deal with the truthfulness of statements Burnett made at various times (Exh. 3, Tabs 24, 54, 57). In one conversation, Burnett tells his attorney that Benton is not cooperating with the government because Burnett told him not to cooperate (Exh. 3 Tab 24). Burnett was cross-examined at trial on the issue of his influence, if any, over the cooperation of other witnesses and what effect that had on Burnett's own credibility (Tr. at 1529). The information in the subject tape-recorded conversation is cumulative of what was already covered in Burnett's cross examination. Additionally, Benton did cooperate with and testify on behalf of the government at trial, contrary to Burnett's tape recorded statement that he told Benton not to cooperate. This undeniable fact diminishes whatever favorable impact Burnett's tape-recorded comments to the contrary may have had for the defendants.

Furthermore, at trial, Burnett was questioned about a tape-recorded conversation he had with his wife wherein Burnett said counsel for the government made certain promises to him. In his trial testimony, Burnett said government counsel never made those promises and his statements to his wife to the contrary were lies. On two tape-recorded conversations with his attorney, Burnett attributes the same promises to the government counsel which were attributed in the conversation with his wife (Exh. 3, Tabs 54, 57). The defendants argue that these conversations are corroborative of the conversation Burnett had with his wife and that Burnett's trial testimony that what he told his wife was a lie is itself not true.

10

While the tape-recorded conversations are corroborative of the conversation Burnett had with his wife and which was the subject of his cross examination, the defendants were successful in getting Burnett's admission on cross-examination that he was lying to his wife on the tape recording with her. Burnett's admission that he lied to his wife is more damaging to his credibility than any corroborative value the other tape-recorded conversations might have at trial. The non-disclosure of these conversations did not have a material effect on the outcome of the trial. Further, the promises Burnett attributes to the government counsel, even if made, dealt with Burnett's cooperation and had nothing to do with the guilt or innocence of the defendants.

### 3. Credibility of other witnesses

Burnett's opinion of the credibility of other witnesses was the subject of three tape-recorded conversations (Exh. 3, Tabs 5, 22, 23). Burnett's opinions about the truthfulness of other witnesses is likely irrelevant opinion evidence. Additionally, it appears that Burnett made some of these statements in a discussion with his attorney about the strength of the government's evidence against him, not in the context of witnesses cooperating against the defendants or evaluating the evidence against the defendants (Exh 3, Tab 5). The non-disclosure of these tape-recorded conversations had no effect on the prosecution of the case.

### 4. The government's case

Several of Burnett's tape-recorded conversations with his attorneys dealt with their discussion and evaluation of the government's evidence and theory of the case (Exh. 3, Tabs 1, 5-6, 19, 54, 57). These conversations have minimal relevance to Burnett's credibility and no relevance to the guilt or innocence of the defendants. Further, some of these conversations appear to have occurred before Burnett acknowledged his role in the crimes and agreed to

cooperate ( Exh 3 Tabs 1, 5-6).  One would expect Burnett's initial denials of his own and his

co-defendants involvement in the charged crime to carry little weight with the jury after his

decision to cooperate with the government and confess his responsibility for the crimes charged.

Additionally, to the extent the conversations deal with the role of Burnett or others in the

robberies, that was a subject that the defendants had adequate opportunity to explore on cross-

examination at trial.  The failure to disclose these tape-recorded conversations prior to trial had

no effect on the prosecution of the case and did not materially affect the credibility of Burnett.

## 5.  Sequestrations of witnesses

Finally, the defendants argue that one tape-recorded conversation between Burnett and

his attorney represents a violation of the Court's order, pursuant to FED. R. EVID. 612, with

respect to the sequestration of witnesses during trial (Exh. 3, Tab 58).  This conversation appears

to have occurred after trial began and, according to the defendants, is a discussion between

Burnett and his counsel about the testimony of other government witnesses.  Because this

conversation occurred after trial began, it could not have been disclosed to the defendants before

trial.  Moreover, even if it were disclosed to the defendants during the course of trial, it is unclear

who the other witnesses were that were being discussed, whether they testified before or after

Burnett, and whether this discussion actually evidences a violation of the Court's order

concerning witness sequestration.  However, even assuming the conversation is evidence of a

violation of the Court's trial order concerning witness sequestration, the defendants have shown

no prejudice resulting from the alleged violation.  Accordingly, the Court reaches the conclusion

that the failure to disclose this tape-recorded conversation did not affect the prosecution of the

case or have any likelihood of changing the outcome of the case.

12

After making an independent review of the record, it is

**RECOMMENDED** that the Court find that the failure any of the 199 tape recorded conversations between co-conspirators and their attorneys did not have any affect on the prosecution of this case and was not likely to have changed the outcome of the trial.

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*

**John T. Maughmer**
**Chief United States Magistrate Judge**

13