# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 00-00004-01/08/09-CR-W-ODS |
| MICHAEL HATCHER, et al., | ) ) ) |
| Defendants. | ) |

## ORDER AND OPINION ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING REQUEST FOR NEW TRIAL

On June 22, 2005, the Honorable John T. Maughmer, Chief United States Magistrate Judge for this district, issued his Report and Recommendation ("Report") wherein he recommended the Court find the outcome of Defendants' trial would not likely have been different had they been supplied with certain tape recordings between a witness and his attorneys. Defendants filed objections, and the Court has conducted a de novo review of the record. The Court now adopts the Report's findings and recommendations.

## I. BACKGROUND

Following a jury trial, Defendants Michael Hatcher, Angelo Porello and Joseph Porello were convicted on a variety of charges stemming from a string of jewelry store robberies. Prior to trial, Defendants were provided access to conversations of cooperating witnesses that had been recorded while the witnesses were incarcerated in pretrial detention centers, except for conversations between the witnesses and their attorneys. On appeal, the Eighth Circuit held this Court's orders rejecting Defendants' request for the those excepted recordings to be erroneous because "[t]he presence of

the prison recording device destroyed the attorney-client privilege." United States .v Hatcher, 323 F.3d 666, 674 (8th Cir. 2003). The case was remanded "to the District Court to consider what effect, if any, the disclosure would have had on this prosecution. This will provide the government with the opportunity to argue that the non-disclosure of the tapes was harmless error." Id.[1]

Prior to trial, Defendants received copies of approximately 5,200 recorded conversations. The conversations with attorneys were not transcribed or organized until after the case was remanded from the Court of Appeals, at which time 199 such conversations were identified. Fifty-eight of them were offered into evidence, forty-two of which were the topic of discussion before Judge Maughmer. Only seven are addressed in Defendants' objections, so the Court's discussion will focus on those seven recordings. The Report's discussion of the remaining fifty-one recordings offered into evidence will be adopted *en toto* by the Court.

## II. DISCUSSION

The failure to divulge evidence[2] violates the Constitution "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the

---

[1] The majority also indicated this Court could "allow the parties to pursue the issue of the government's standing by supplemental briefs, evidence, or otherwise." Hatcher, 323 F.3d at 674 n.2. In his separate concurrence, Judge Bye "encouraged" this course. Id. at 675. However, the issue has not arisen, possibly because the parties believe the posture of the case has rendered the issue tangential at best. Armed with the majority opinion that the tapes should have been released, the issue of the Government's standing to object to the release appears irrelevant and the parties have focused on the potential for prejudice from the non-disclosure.

[2] In their objections, the Porellos couch their legal argument in terms of Confrontation Clause violations. This represents a change in reasoning in that their arguments to Judge Maughmer were based on the Government's failure to produce evidence in violation of Bagley and Brady v. Maryland, 373 U.S. 83 (1963). Moreover, the cases relied upon involved limitations on cross-examination and not the failure to produce evidence. United States v. Beckman, 222 F.3d 512, 524 (8th Cir. 2000), Harrington v. Iowa, 109 F.3d 1275, 1277 (8th Cir. 1997). For these reasons, the Court applies the standards from Bagley and Brady.

2

trial." United Staes v. Bagley, 473 U.S. 667, 676 (1985).  This occurs only when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996) (quotations omitted); see also Clemmons v. Delo, 124 F.3d 944, 949 (8th Cir. 1997), cert. denied, 523 U.S. 1088 (1998) (quotation omitted).  This determination is made by considering the combination of the excluded evidence and the evidence actually introduced at trial.  Gonzales, 90 F.3d at 1368.  This analysis applies to evidence that is exculpatory as well as to evidence that may be useful for impeachment.  Bagley, 473 U.S. at 676.

The seven recordings addressed in Defendants' objections all involve conversations between Clarence Burnett and various attorneys.  There is little dispute that Burnett was the Government's key witness.  As the Eighth Circuit observed,

> [t]he evidence against Mr. Hatcher consisted primarily of Mr. Burnett's testimony against him, although that testimony was corroborated by independent sources, including phone records of conversations that took place after the robbery.  There was substantial evidence indicating that the Porellos acted as the fences for the jewelry.  The only evidence directly linking the Porellos to the planning of the crime, on the other hand, came either from Mr. Burnett on the witness stand or through other witnesses relating what Mr. Burnett had told them at the time of the robberies.

323 F.3d at 669-70.

Burnett testified for approximately eleven hours, eight hours of which was spent on cross-examination.  Tr. at 1478, 1647, 1764-65.  Generally speaking, he testified that he organized a group to execute jewelry store robberies planned by the Porellos.  Hatcher was one of the people Burnett recruited to participate in the robberies.

As might be expected given the length of cross-examination and the importance of Burnett's testimony, counsel for all the defendants engaged in a variety of attempts to impeach his credibility.  The jury learned of inconsistencies between Burnett's trial testimony and (1) Burnett's grand jury testimony, Tr. at 1418-19, 1629-31, (2) Burnett's handwritten notes, Tr. at 1680-81, 1788-89, 1801-04, and (3) notes of interviews

3

prepared by FBI agents. Tr. at 1406-08, 1416-17, 1419-21, 1425-26, 1628, 1681, 1704-05, 1711-12, 1789-90, 1796-98. The jury learned Burnett faced a sentence of thirty years to life on a drug conviction and a sentence of 188 to 235 months for the jewelry store robberies, Tr. at 1236-37, 1243-44, 1361, 1591, that certain charges had been dismissed (including firearm charges that would have required imposition of significant consecutive sentences), Tr. at 1243, 1445, 1592-93, and that he expected a reduced sentence for cooperating with the Government in this trial. Tr. at 1237, 1498-1500, 1522-23, 1527-28, 1541, 1573-76. He conceded that he hoped to be released immediately, but understood the ultimate decision would be made by the sentencing judge and denied that any promises had been made about his sentence. Tr. at 1243, 1362, 1576-78, 1581, 1583, 1593, 1606, 1780-81.

With this general background established, the Court now turns to the seven conversations that are the subject of Defendants' objections.

*1. Tab 23*

Defendants argue this conversation demonstrated Burnett's belief that "he had absolute control over the government's witnesses' testimony" and that the Government would not obtain additional witnesses without his help. Placed in context, Burnett's statements in this conversation are not particularly ominous.

The relevant portion of the conversation actually starts with Burnett asking whether he can be charged with any of the crimes he told the authorities about if the authorities can find witnesses to testify against him. (Tab 23, page 27). Counsel confirms Burnett cannot be charged based on information he supplies but "[i]f they develop it independently they can." Upon further questioning from Burnett, counsel explains the Government's information cannot be derived from any information Burnett provided. During the course of the conversation, counsel explains that the Government must "show that they got that other witness without you" and Burnett responded by stating "Oh, well, that's not gonna happen." The conversation continues, with the

4

attorney expanding on his explanation and advising Burnett of the circumstances in which the Government can use information against him.  Their conversation abruptly ends, (Tab 23, page 31), but the call is placed again almost immediately and counsel's description of evidence the Government could claim to have been independently derived resumes. (Tab 24).

In context, it is clear Burnett did not claim he "controlled" witnesses.  Burnett offers his belief that the only way the Government learned about certain witnesses was through his own proffers.  This belief was expressed during a conversation about what kinds of evidence the Government could use against him.  The Court concludes this evidence could not have been used to impeach Burnett's trial testimony.

As a final note, the Court notes Burnett provided much more damaging testimony in this vein at trial.  He admitted he "bribed" his cousin (Larry Ray) to keep him from providing further cooperation, Tr. at 1320, 1400-02, and discussed the value of cooperation with other individuals.  Tr. at 1528-29, 1533-34, 1541-42.

*2.  Tab 24*

As mentioned in the preceding section, this conversation resumes a discussion of the Government's ability to use certain information to support charges against Burnett. Burnett asks the attorney whether charges against him could be based on information supplied by Thomas Benton if he (Burnett) provided information about crimes Benton committed, and the answer is in the negative.  (Tab 24, pages 8-9).  Burnett then states he does not care whether Benton cooperates because he has superior information about the crimes Benton knows about and theorizes that "it would be stupid for [Benton] to cooperate without me."  (Tab 24, page 9).  Burnett then states "the only way Benton's going to cooperate – the reason why he ain't cooperated thus far is because I told him not to."  Defendants advance this statement as further proof that Burnett "controlled" witnesses.

5

At trial, Burnett explained that he was the leader of the gang, and that he had superior knowledge of the crimes and held greater value as a witness. Tr. at 1572-75. The jury knew Burnett discussed the potential for cooperating with others involved in the robbery. When compared to the rest of his testimony, the single sentence indicating Burnett told Benton not to cooperate would have had a negligible impact on his credibility.

*3. Tab 27*

During this conversation, Burnett and his attorney discuss a letter received by Benton indicating Benton was going to be charged with certain crimes. (Tab 27, pages 1-2). In discussing how he knew the contents of the letter, Burnett stated "He read it to me. . . . . I talked to him on the phone. You know I got a conference line." (Tab 27, page 3). Defendants argue communications between Burnett and Benton (who were being held in separate institutions) on a "conference line" constituted "a violation of institution rules and provided another means by which the cooperating co-defendants could conform their testimony, without the knowledge of the government." The Court is not certain how this could be used for impeachment purposes but, assuming it could for the sake of argument, Burnett's admission to his attorney was not new. Burnett explained the concept of a "conference line" during his trial testimony and admitted having conversations with Benton about the case. E.g., Tr. at 1247-49, 1251-53, 1254-56, 1363-65, 1561-62.[3] Thus, Burnett's statements to his attorney were cumulative to information already known to the jury.

---

[3]Burnett and Benton were allowed to make outgoing calls, but could not receive calls. To communicate via phone, the two of them called a conference call box Burnett placed at his mother's house.

6

*4. Tab 30*

The topic of this conversation are particulars of Burnett's plea agreement. At one point, Burnett asks what the Government has said "about the forfeiture." Burnett's attorney responds "They're still – they'll go with the forfeiture. They will go with the forfeiture. They're just going to give us a side agreement on that." (Tab 30, page 4). This exchange obviously follows from a prior conversation between Burnett and his attorney, but no additional specifics are provided by the participants. Most importantly, there is nothing in this brief exchange that suggests (as Defendants do) that it relates to some expectation on Burnett's part that he will receive payment from property forfeited by the Government.

During the trial, Burnett testified that he thought about asking the Government for a share of the forfeiture, but never did so. Tr. at 1525-26. Certainly, there is nothing in the plea agreement allowing for such consideration, and the Court would find it incredible if such an arrangement existed. The Government sought forfeiture against the defendants in this case but not against Burnett; perhaps the "side agreement" involved the Government's decision not to seek a forfeiture against him.[4] Ultimately, there is no proof that Burnett's lawyer's statements mean what Defendants insinuate.

*5. Tab 36*

Defendants contend this conversation demonstrates "Burnett indicated his intention to raise a false defense of mental capacity after he testified in order to receive a further reduction in sentence" and is offered as evidence Burnett was willing to manipulate the system and was beyond the Government's control. The Court concludes this is not a fair characterization of the conversation.

---

[4]It should be noted that Burnett's sentence includes and order of restitution.

Burnett reveals to the lawyer on the phone that he has fired his prior lawyer and replaced him with a new one. Burnett explains that his new attorney recommended he see a psychologist in the hopes of obtaining a sentencing departure. The suggestion was made based on biographical information contained in Burnett's Presentence Investigation Report ("PSI") and Burnett requests this lawyer's thoughts. (Tab 36, page 2). The lawyer on the phone disagrees with the recommendation, explaining that it undercuts Burnett's value as a viable witness for the Government which, in turn, undercuts Burnett's bargaining position with the Government. (Tab 36, pages 3-4, 8). The attorney also expresses concern that Burnett's security classification might be affected. (Tab 36, page 5). Burnett then asks whether he should see a psychologist after he testifies for the Government but before he himself is actually sentenced, and the attorney again counsels against this course of action. (Tab 36, pages 14-17). Fairly characterized, the conversation does not reflect Burnett is planning to do anything, but rather that he is seeking a second lawyer's opinion about a course of action proposed by another lawyer. Moreover, the conversation does not reflect Burnett contemplated providing *false* testimony. As he alluded to in his conversation, Burnett's PSI (like all PSI's) contained biographical information to assist the sentencing judge in arriving at an appropriate sentence. There is nothing improper or "false" about augmenting that information with expert testimony or using it to argue for a departure or a sentence in a particular range (particularly when, as here, Burnett anticipated the Government would file a motion to permit the sentencing judge to depart below the mandatory minimum).

### 6. Tabs 54 & 57

These conversations, with two different attorneys, involve the same subject matter and will be addressed together. The first conversation took place on August 21, 2000, and begins with Burnett asking his attorney questions about Sentencing Guideline calculations and expressing his hope that the sentencing court does not simply cut the thirty year minimum sentence in half. (Tab 54, p. 5). The attorney confirms that the

8

more cooperation Barnett provides the greater his benefit might be. (Tab 54, pp. 5-6). Barnett then relates that the Assistant United States Attorney ("AUSA") compared him to some other witnesses that, in Burnett's words, "cooperated. But, they went straight home, you know what I'm saying? He told me that what I'm doing is on the same level and he said that my case, he says, this ain't a normal case." (Tab 54, p. 7).

The second conversation took place on January 25, 2001. Burnett's attorney offers a rather rosy picture of Burnett's prospects. He suggests he might argue for "a sentence of two years," (Tab 57, p. 7), later says "what would make me happy is if you got out like right after sentencing" and in response to Burnett's questions confirms such a sentence is "possible." (Tab 57, p. 10). Burnett then volunteers that he had a conversation with the AUSA, who told him "about some dudes over here with like about the same amount of time. And then they testified and then they went straight to halfway house and he kinda told me that I was in their position, you know." (Tab 57, p. 11).

The alleged importance of these statements relates to a July 12, 2000, conversation between Burnett and his wife that was played for the jury. In that conversation, Burnett told his wife that he expected to be out shortly after trial. However, at trial he denied that any representative from the Government made such a promise to him; his statement was "[n]ot based upon my perceptions [of the AUSA], based upon being that I talked to him, in my opinion, that I should be, but I was never told that by anyone." Tr. at 1577-78, 1581-83. Later, Burnett testified he lied to his wife in an attempt to "give her some hope. But it had nothing to do with somebody telling me something or nothing like that. Because I already know whatever time I get is, specifically, up to the judge." Tr. at 1781.

In calculating the probable effect of these statements on the jury's assessment of Burnett's credibility, the following facts must be remembered. First, it was abundantly clear that Burnett lied: he testified that he lied to his wife, which the jury may have believed; if it did not believe Burnett's confession, the jury would have believed Burnett told his wife the truth and his testimony was a lie. Either way, the jury knew Burnett lied. Second, Burnett repeatedly testified that he was not promised anything particular in

9

terms of a sentence and that the ultimate decision about the sentence rested with the sentencing judge.  Third, the conversations with the attorneys contain numerous instances in which Burnett was told the ultimate decision rested with the sentencing judge.  Fourth, Instruction No. 25 told the jury the ultimate decision rested with the sentencing judge.  Fifth, it is correct to state the ultimate decision rests with the judge; once the Government files a motion for downward departure, the sentence is left to the court's discretion.

In light of these facts, the Court does not believe Burnett's statements to his attorneys contained any "extra" value beyond that which was established by events at trial.  The tapes could have further substantiated Burnett as a liar – but the jury already knew that.  They could not demonstrate Burnett expected a particular sentence because the jury was told such a promise would have no effect.

### III.  CONCLUSION

The Court has considered the excerpts identified by Defendants in light of the evidence admitted at trial.  For the reasons expressed in Judge Maughmer's Report and this Order and Opinion, the Court's confidence in the verdict is not undermined and Defendants are not entitled to relief.

In accordance with the Eighth Circuit's directive, the Clerk of Court is directed to send a certified copy of this Opinion and Order (along with a certified copy of Judge Maughmer's Report, because its reasoning has been partially incorporated herein) to the Court of Appeals.

IT IS SO ORDERED.

DATE: August 9, 2005

/s/ Ortrie D. Smith  
ORTRIE D. SMITH, JUDGE  
UNITED STATES DISTRICT COURT